IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DANIEL SWANSON | § | |
| | § | |
| ***Plaintiff***, | § | |
| | § | |
| v. | § | **Case No. 1:26-cv-1382** |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | **JURY DEMANDED** |
| ***Defendant***. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

**PLAINTIFF'S ORGINAL COMPLAINT**

Plaintiff Daniel Swanson now brings this action against International Business Machines Corporation (IBM) pursuant to 29 U.S.C. §§ 621 – 634 under the Age Discrimination in Employment Act, (ADEA) and pursuant to Texas Labor Code § 21.051 under the Texas Commission on Human Rights Act. Plaintiff pleads as follows:

# I. INTRODUCTION

1. Plaintiff Daniel Swanson's 24-year career at IBM was cut short by an ageist scheme created and executed by IBM executives.

2. The scheme—which is in effect a discriminatory transformation plan aimed at reducing company-wide employee age—has been the subject of numerous age discrimination lawsuits.[1] ProPublica extensively investigated and documented IBM's nefarious multi-year plan to target and replace older workers in 2018.[2] The U.S. Equal Employment Opportunity Commission conducted an independent and thorough investigation and determined that over a period of several years IBM's "highest-ranks" engaged in "top-down messaging" that "directed its managers to engage in an aggressive approach to ***significantly reduce the headcount of older workers to make room for EPH***."[3] In this context, "EPH" is an IBM-created classification for predominantly college-aged new hires that are almost always decades younger than their laid-off counterparts they were intended to replace *en masse*.

3. The EEOC also found ***evidence of a discriminatory animus at the IBM leadership level***, where for years the rolling layoffs had disproportionately impacted older workers (85.85%). The EEOC ultimately concluded that IBM's defense to the age discrimination claims "[did] not withstand scrutiny" and there exists "reasonable cause to believe" older employees were "discriminated against…on account of their age."[4] The same scheme that was exposed by

---

[1] The illegal scheme of IBM is further corroborated by the Exhibits attached to the Amended Complaint in *Townsley v. IBM*, Case 1:20-cv-00969-LY Dkt.. 5. (filed 10/07/20).
[2] Peter Gosselin, *The U.S. Equal Employment Opportunity Commission Confirms a Pattern of Discrimination at IBM*, PROPUBLICA, (Sept. 11, 2020) https://www.propublica.org/article/the-u-s-equal-employment-opportunity-commission-confirms-a-pattern-of-age-discrimination-at-ibm.
[3] **Ex. 1**, IBM Corporation's U.S. EEOC Determination, pgs. 1-2. (September 3, 2020) (emphasis added).
[4] *Id.* ("The Commission's investigation reveals that Respondent conducted Resource Actions analyzed by the EEOC between 2013 and 2018 that had an adverse impact on employees in the

ProPublica and then formally corroborated by the EEOC is still *alive and well* at IBM today. Plaintiff is merely one of the latest victims of the shared scheme.

### A. THE SCHEME

4. Beginning several years ago, the executive leadership of IBM began to use a series of company-wide methods to target and eliminate older workers while contemporaneously hiring younger employees ("Early Professional Hires" or "EPH") and exempting those younger workers from the ongoing rolling layoffs. A cadre of top executives developed the plan in a way that included weaponizing artificial intelligence and scoring algorithms against older workers by using age-correlated selection criteria, as well as biased predictive analytics. Human Resources implemented the plan by using the unfairly-weighted criteria and analytics to pre-select employees for layoff without even consulting first line managers. Finance made the math work and provided the business case for mass exits of older employees. Cognizant that its efforts to "revitalize" its workforce violated anti age-discrimination laws, Legal devoted significant time and resources to devising tactics and procedures to avoid detection and create plausible deniability.

5. Veiled corporate language—crafted and employed by the highest-level executives—served to obscure that actions were being taken designed to fire the old to make way for the young. Executive planning documents are replete with terms such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation"—catchy corporate coded language that permitted executives to speak about illegal discrimination in a way that avoided detection, gave cover, and provided

protected age group (PAG). The investigation uncovered top-down messaging from [IBM's] highest ranks directing managers to engage in an aggressive approach to significantly reduce the headcount of older workers to make room for Early Professional Hires.").

plausible deniability. As of late 2021, IBM confirmed that many of these documents "provide insight into IBM's decision-making processes that are still being used today."[5]

6. To execute the scheme, IBM executives mandated companywide annual rolling layoffs. Notably, IBM labelled these layoffs as "Resource Actions," unique nomenclature for layoffs specific to IBM. The "Resource Actions" (RAs) were implemented companywide—but were purposefully broken up into smaller sub-groups to better shroud its discriminatory animus in secrecy. These mass RAs were company-wide projects and were given secret code names and tightly scheduled across multiple business groups and geographies to occur at the same time.

7. From high echelons of IBM, orders were given to front line managers to create impossible-to-meet performance goals for older workers. Failure to achieve the impossible was then used by IBM to create baseless negative performance reviews to justify subsequent terminations. IBM also employed techniques to reduce artificially employees' favorable performance review scores—which gave further cover for terminations.

8. There exists evidence that the HR department and executives several levels up from an employee's front-line manager placed employees on secret internal RA lists that marked them for termination long before first-line managers ever even knew that their subordinate had been pre-selected for termination. IBM would then use first-line managers as "cat's paws" for the discriminatory termination pre-approved by HR. HR would then obfuscate this termination decision to make it seem like it was actually the first-line manager's decision to terminate that employee.

[5] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp.*, No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2.

9. In *Langley v. IBM*, a Federal Court in Texas analyzed this exact issue, and ruled that "internal IBM corporate planning documents" provided cause for the Court to establish a fact question as to if "IBM executives sought to lay off older workers in an effort to hire a younger workforce."[6] The Court additionally determined that evidence existed that IBM's hire-and-fire scheme effectively told first-line managers who to lay off, and then used them to further conceal IBM's top-down ageist animus.[7] The Southern District of New York has also weighed similar documents—and declared that they would be "directly relevant" to the ADEA claims made here that would "on their face appear to show an effort to remove older employees in favor of younger employees."[8]

10. While actively firing effectively *thousands* of its older workers, IBM was simultaneously busy hiring young employees *en masse* to replace the laid-off older workers. To hide the replacement, IBM would frequently create different job titles and shift organizational structures to make it harder to detect that IBM had not eliminated a position, but instead merely replaced older workers with younger workers. To ensure that the Resource Actions did not accidently target coveted young Early Professional Hires, IBM skewed the pool of people who could be targeted by creating policies that explicitly excluded younger employees, despite their job performance, from the rolling layoffs.

---

[6] *Langley v. Int'l Bus. Machines Corp*., No. 1:18-CV-443-DAE, 2020 WL 8052973, at *4 (W.D. Tex. Feb. 28, 2020) ("In this case, the evidence creates a factual issue as to whether [the first-line manager] was in fact effectively told whom to lay off, as well as whether her and her supervisors' attempts to place [the employee] in different positions were overruled by HR and IBM executives.").

[7] *Id.*

[8] *Lohnn v. Int'l Bus. Machines Corp.,* No. 21-CV-6379 (LJL), 2022 WL 364320, at *12, *6 (S.D.NY. Jan 4, 2022), appeal withdrawn, No. 22-32, 2022 WL 182320899 (2d Cir. July 25, 2022).

11. IBM also employed complex and byzantine procedures to prevent the targeted older employees from finding new jobs at IBM for which they were qualified. This included policies that prohibited laid-off employees from transitioning into new roles or new jobs at a lower level. There were also policies that reclassified fired older employees at IBM as retirements or performance-based terminations.[9]

**B. EXECUTIVE STATEMENTS, CONDUCT, RECRUITING MATERIALS, & PUBLICATIONS REFLECT AGE ANIMUS.**

12. In the recent past, IBM's leadership embarked on a massive "reinvention" and rebranding campaign aimed at attracting younger employees, or EPHs. Younger employees are key for IBM because the companies are faced with competition from other companies acquiring younger workers in the tech sector and beyond. The leadership at IBM has displayed discriminatory animus numerous times—including expressing the belief that older workers constitute a poor return on investment because they lack the ability to learn new skills, to embrace changing technology, or to collaborate with their colleagues. IBM recently corroborated the existence of its ongoing efforts to "***bring in as much young talent into the workforce***" [10] while still continuing its rolling layoffs that target older employees.

13. Current marketing materials from IBM also not-so-subtly advertise the young age demographics sought by the company:

---

[9] Similar sealed documents were discovered in prior litigation handled by the undersigned. *See Langley v. Int'l Bus. Machines Corp.*, No. A-18-CV-443-LY ,2019 WL 4577115, at *3 (W.D. Tex. Sept. 20, 2019); *see also Townsley v. Int'l Bus. Machines Corp.*, No. A-20-CV-00969-DAE, 2022 WL 2655197, at *2 (W.D. Tex. July 8, 2022).

[10] Shivani Shinde Nadhe, *IBM's new team to focus on millennials*, BUSINESS STANDARD (May 31, 2024) https://www.business-standard.com/article/companies/ibm-s-new-team-to-focus-on-millennials-116053000677_1.html (emphasis added).


ibm.com
IBM
Products
Solutions
Consulting
Support
Think
TechXchange 2024
IBM Careers
Life @ IBM
Teams
Entry level
Resources
What we stand for
Our words and actions
Explore more insights
Stay connected
Let's create!
When we collaborate, that's when the best gets made.
1:20


careers.ibm.com
IBM
IBM Careers
English
Let's connect!
Stay connected by joining our Talent Network. Tell us more about yourself and we'll keep you up to date regarding upcoming events and career opportunities that match your interests.
*Fields required
First Name*
Input text
Last Name*
Input text
Primary Email*
Input text
Resume
Upload your resume as docx or pdf with a maximum size of 2 mb.
Upload resume
Primary Country/Region*
Choose an option
Experience Level*
Choose an option
Area of Interest*
Choose an option
Communities of Interest
Choose an option
* I confirm that I have read, understand and agree to IBM's Privacy Policy.
I agree*


ibm.com
IBM
Products
Solutions
Consulting
Support
Think
TechXchange 2024
IBM Careers
Life @ IBM
Teams
Entry level
Resources
Home / Careers
Define your career with IBM
Our curiosity runs deep. That's why we let you explore new paths at your own speed—making sure you're constantly learning. Discover the possibilities with IBM Careers.
Let's get started
Work we're doing


ibm.com
IBM
Products
Solutions
Consulting
Support
Think
TechXchange 2024
IBM Careers
Life @ IBM
Teams
Entry level
Resources
What we stand for
Our words and actions
Explore more insights
Stay connected
octagon
TRAIN
Ali
"If you're putting in your best effort, you'll get where you want and achieve what you desire."
Imran
Doha
LGBTQ+ community

14. The discriminatory animus of IBM executives is likewise well documented, and it drives the strategy for elimination of their respective older workers. According to IBM's own internal tracking in 2016, the average age of employees at IBM in total was around 39 years old. Despite that relatively young average age, the tracking set off a focused effort by IBM's senior executives to reduce the average age and increase the percentage of the workforce in the coveted Millennial cohort. When then CEO Rometty learned that the IBM workforce was made up of 42% Millennials, she instructed that 42% was not acceptable, and that the Millennial percentages needed to be higher. HR Executive Sam Ladah reported to the C-Suite that upon completion of upcoming mass RAs know as Projects Saturn and Solitaire, the percentages of Millennials would improve at IBM because the math built into those operations would execute the discriminatory purpose of firing older workers to make room for more Millennials.

15. Over the ensuing years, the focus, tracking, and reporting on age at IBM was relentless at the executive level. The average age of the workforce was consistently updated to the C-Suite, which carried those stats into updates to the Board of Directors as part of reporting on the initiative to transform IBM into a young company.

16. Prominent media outlets have corroborated the existence of these discriminatory RAs and the animus that motivated them. For example, in 2022 the New York Times reported that IBM "executives discussed in emails how to force out older workers and derided them as 'dino babies' who should be made an 'extinct species.'"[11]

[11] **Ex. 2**, Noam Scheiber, *Making 'Dinobabies' Extinct: IBM's Push for a Younger Work Force,* THE NEW YORK TIMES (February 12, 2022); Jack Kelly, Forbes, available at https://www.forbes.com/sites/jackkelly/2022/02/12/ibm-accused-of-ageism-older-workers-are-dinobabies-who-should-be-made-an-extinct-species/https://www.nytimes.com/2022/02/12/business/economy/ibm-age-discrimination.html.

17. In one IBM publication, "Myths, exaggerations and uncomfortable truths – The real story behind Millennials in the workplace," the company flattered the Millennial generation it sought to recruit.[12] Simultaneously, the company disparaged older Gen X and Baby Boomer employees in another publication.[13] In an IBM consulting services paper titled "The Maturing Workforce," IBM referred to older workers as "gray hairs" and "old heads."[14] Years later, IBM publicly doubled down on these stereotypes, characterizing older employees as suffering from workplace "dysfunctions."[15] The same IBM paper alleged that "older employees" were allegedly less trusting of their co-workers, less collaborative, less committed, less accountable, and less attentive to results.[16] It also stated that Baby Boomers—when compared to other generations of employees—were the least likely to understand IBM's business strategy, least likely to understand their manager's expectations of them, least likely to understand what customers wanted, and the least likely to understand IBM's brand.[17]

18. The evidence corroborates that the scheme has continued without a hitch. Shortly after a round of IBM layoffs targeting its most loyal, longtime employees, the company published an article aimed at "get[ting] the Gen Z generation excited about good-paying jobs" at IBM.[18]

---

[12] Mark Eltringham, *Myths and Uncomfortable Truths*, WORK PLACE INSIGHT (Feb. 27, 2015), available at https://workplaceinsight.net/ibm-exposes-myths-exaggerations-and-uncomfortable-truths-about-generation-y/.
[13] Peter Gosselin, *Cutting 'Old Heads' at IBM*, PROPUBLICA (March 22, 2018), available at https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.
[14] *See id*.
[15] Managing Millennials: 5 Common Issues Leaders Face (August 24, 2016). (The original content has been removed).
[16] *Id.*
[17] *Id.*
[18] IBM Z for Gen Z Part 1 March 22, 2024, https://community.ibm.com/community/user/ibmz-and-linuxone/blogs/sandeep-batta/2024/03/22/ibm-z-for-gen-z-part1?communityKey=b8b88f20-24c8-49f0-9021-4a8c6247a067.

### C. THE SCHEME CONTINUES. NOTHING HAS CHANGED.

19. Far from being over, IBM continues its ageist scheme to rid itself of its older workers. In a nearly identical lawsuit against IBM based on age discrimination, a current IBM executive named Sam Ladah—in an attempt to keep ageist IBM executive level planning documents confidential—attested that all of the planning documents are still relevant to IBM's current business practices. To wit, he attested on August 27, 2021, that "even though some of the documents are five to six years old, they provide insight into IBM's decision-making processes that are still being used today" and that the documents contain "IBM's ***current*** thinking and decision making process" and that "IBM continues to hire along similar tracks today."[19]

20. Despite announcing in 2022 that no more major layoffs would occur, in 2023, CEO Arvind Krishna approved the termination of thousands of older employees through the tried and true, "fire-and hire" Resource Action scheme. A recently leaked video of Krishna confirms that IBM has continued its practice of using secretive top-down pressure to gerrymander its workforce to reflect the demographic preferences of its Executives.[20] In this video, the CEO told employees that if they do not hire the desired race of employee, he will ensure they will lose their bonuses.

21. In *Wimbish v. IBM*, it was made clear that even HR managers—now plaintiffs themselves—know the scheme is continuing. In their complaint, these fired HR managers alleged that IBM's HR still constantly consider an employee's "runway" when determining if that worker

---

[19] *See* Decl. of Sam Ladah, *Townsley v. Int'l Bus. Machines Corp*., No. 1:20-cv-00969-LY, Aug. 27, 2021 (WDTX) ECF No. 59-2 (emphasis added).
[20] Okeefe Media Group, *Leaked IBM Video*, INSTAGRAM, (December 11, 2023), available at https://www.instagram.com/okeefemedia/reel/C0u7vvDMypu/.

would be terminated. "Runway" is coded language for how long IBM HR expects an employee to remain at IBM before they retire, a direct proxy for age.[21]

22. The *Wimbish* plaintiffs also stated that they were deeply familiar with IBM's recent and continued obsession with age during mass layoffs. These former HR managers allege that decision makers at IBM were constantly referring to a need for employees with "new skills" or "new energy"—more coded language for younger workers.[22] One *Wimbish* plaintiff even received a list of the people slated for termination, including their respective ages. This list of "IBM's best and brightest among the HR organization . . . were also some of the Company's older and most senior HR partners."[23] Court documents and all available evidence accordingly reveal that the ageist illegal scheme is alive and well, and that Daniel Swanson is one of its newest victims.

## II. PARTIES

23. Plaintiff Daniel Swanson is a citizen of the United States and is a resident of Texas. He timely filed a charge of age discrimination with the EEOC after he was terminated at age of forty-eight (48) as a direct result of IBM's ageist scheme to fire its older workers discussed *supra*.[24] Plaintiff was in the protected group at the time of the adverse employment action and was entitled to protections consistent with the goals promulgated by the ADEA and the TCHRA.[25] Plaintiff was discriminated against via this illegal scheme that resulted in an adverse employment action

---

[21] *See* Orig. Compl., *Wimbish v.. Int'l Bus. Machines Corp*., 7:23-cv-08327, Sept. 20, 2023, (SDNY) ECF No. 1, at 1 – 2 (emphasis added).
[22] *Id*. at ¶ 37 – 38.
[23] *Id*. at ¶ 45.
[24] *See* **Ex. 4**, *Swanson Termination Email*, **pg. 1**.
[25] **Ex. 2**, "The State of Age Discrimination and Older Workers in the U.S. 50 Years After the Age Discrimination in Employment Act (ADEA)" by Victoria A. Lipnic, Acting Chair of the U.S. Equal Employment Opportunity Commission.

due to his age. He now brings this case to vindicate his rights under the ADEA and under Texas State law.[26]

24. Defendant IBM is a New York corporation with its principal place of business at 1 New Orchard Road in Armonk, New York, 10501. IBM is a technology company that provides both equipment and services in the fields of computer hardware, computer software, cloud computing, data analytics and artificial intelligence. IBM is a Fortune 500 company that employs hundreds of thousands of people.

## III. JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over Plaintiff's claims under 29 U.S.C. § 626(b), which authorizes federal jurisdiction over any action to enforce the ADEA. Accordingly, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the Plaintiff is a natural person seeking redress for Defendant's violations of his civil rights under the ADEA.

26. This Court has supplemental jurisdiction over Plaintiff's related state law claim under 28 U.S.C. § 1367.

27. Venue is proper in the Western District of Texas with regard to Defendant IBM under 28 U.S.C. § 1391(b)(2), because Plaintiff was fired while working for IBM in Austin, Texas—meaning the event giving rise to the claim occurred in this judicial district.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

28. Plaintiff timely filed a Charge of Discrimination with the EEOC on March 7, 2025, alleging age discrimination within the requisite statutory period. Such filing occurred within 180 days of

[26] *Id.*

the unlawful employment practices alleged in this Complaint. More than 60 days have passed since the filing of these charges.

## V. FACTS

### A. Background.

29. Plaintiff Daniel Swanson suffered an adverse employment action from IBM.[27] The but for cause of this adverse employment action was IBM's ageist scheme to rid itself of older workers described *supra*. To wit, the circumstances surrounding Daniel's firing contain all the common patterns and tactics of the discriminatory scheme.

30. Those tactics detailed *infra* include being selected for termination, without any grounding in performance or merit-based reality, pre-selected for termination by someone or some *thing*—i.e. Artificial Intelligence—other than his manager, and being replaced by a younger, less qualified employee and being told, directly and indirectly, that the company was focused on a younger workforce. Similarly situated plaintiffs in other lawsuits have repeatedly told the same story—supported by documentary evidence.

### B. Daniel was at all times a highly qualified and model employee at IBM.

31. Plaintiff Daniel Swanson dedicated over twenty-four years of his life to IBM as a loyal, high-performing employee. During his long career he received multiple promotions, raises, performance bonuses, equity awards, and consistently high marks on his performance reviews. Daniel was never placed on a Performance Improvement Plan or given any type of disciplinary action during his employment at IBM. Most recently, as a Software Development Manager, Daniel

[27] *See* **Ex. 4**, *Swanson Termination Email*, **pg. 1**.

managed a team of Software Developers responsible for internal and external IBM data security and privacy protection.[28]

32. During Daniel's employment, he received several advanced technical certifications in project management and software development practices and completed hundreds of hours of internal IBM skills training. Daniel's job performance was never criticized in any manner by IBM, and he was never told that his skills or training were lacking. In fact, several months prior to Daniel's termination, he was specifically commended by both his first and second level managers for his excellent leadership after his role was expanded to include additional responsibilities.

### C. Nevertheless, Daniel was terminated under false presences by someone or some *thing* other than his managers at IBM.

33. Despite Daniel's long tenure, raises, advancements, training, and positive performance assessments, IBM notified Daniel of his termination on September 17, 2024, allegedly as part of a reduction in force ("RA").[29] He was 48 years of age at the time. But high-level planning documents circulated at IBM's leadership level—date marked less than a month after Daniel's firing—specifically noted that IBM *was* hiring, but that it was hiring only a mix of 60% Early Professionals and 40% Campus Hires. Said differently, internal documents show that Daniel was a victim of the scheme as discussed *supra*.

34. To wit, Daniel was formally told by IBM that job was being eliminated, but this was not true. Daniel's job continues to be performed due to the critical nature of the work. However, as opposed to what he was told in writing, Daniel was also told explicitly, in person, by his first level

[28] *See* **Ex. 5**, *Swanson Resume*, **pg. 1**.
[29] *See* **Ex. 4**, *Swanson Termination Email*, **pgs. 1 – 2**.

manager that his selection for termination was not based on either his performance or because his job was being eliminated. In other words, Daniel was fired under a false pretense.

35. Upon his termination, Daniel's job responsibilities were divided amongst two IBM employees, one of whom was younger than Plaintiff.[30] In addition to Daniel, the other three oldest members of Daniel's group were also terminated by IBM at the same time. All three of those former employees had more than 25 years of IBM service.

**D. Daniel was blacklisted and blockaded by IBM from obtaining anther open position at IBM for which he was qualified.**

36. After notice that he would be laid off via a "Resource Action," Daniel sought to find alternative jobs that were open at IBM at that time. At the time, IBM was posting online that it was looking for Product Managers in Austin, Texas—and IBM had Indeed postings seeking a Product Manager to begin that role in January 2025.[31] Daniel applied for two such Manager roles, which were the same roles he had been doing successfully—with high performance reviews and commendations from his direct management—for the prior three and a half years.[32] Thus, Daniel was eminently qualified for each of these positions.

37. On February 20, 2025, Daniel applied for one such open position at IBM for a Software Product Manager role. However, in response, Daniel received an automatic rejection notice from IBM HR, which appeared to be generated by artificial intelligence screening software. At that time, it became clear that IBM's ageist scheme had been programed into its HR screening software, and

[30] ***See*** **Ex. 6,** *Swanson Replacement*, **pgs. 1 – 2**.
[31] **Ex. 9**, *IBM Austin Job Posting*, **pgs. 1 – 2**; *see also* **Ex. 10**, *IBM Indeed Post for Product Manager*, **pg. 1**.
[32] **Ex. 7**, *Swanson Application to Open IBM Role*, **pgs. 1 – 2** (applying for the IBM Power Product Manager" role.).

it was blacklisting Daniel from finding a new role at IBM due to his age.[33] Even currently, long after Daniel's termination, IBM continues to advertise open Software Development Manager and Software Product Manager positions, both of which Daniel remains fully qualified for based on his education, training, and past IBM work history. In March 2025, the IBM website listed more than 30 open positions carrying the title Software Development Manager or Software Product Manager.[34]

38. At bottom, IBM terminated Daniel and blacklisted him from other open positions at IBM because of its ageist scheme to de-age its workforce by firing older workers to make room for coveted Early Professional hires. IBM therefore wrongfully targeted Daniel in this alleged "reduction in force" due to his age—making his career yet another casualty that joins the ranks of victims in this now well documented and systematic pattern of IBM's. Accordingly, but for the ageist scheme and IBM's ageist animus, Daniel Swanson would not have been terminated.

## VI. CAUSES OF ACTION

### A. Count 1: Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et. seq*. ("ADEA") On Behalf of all Plaintiffs.

39. Plaintiff incorporates by reference all allegations in this Complaint.

40. IBM terminated Plaintiff because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1).

41. IBM's violation of the ADEA was knowing and willful.

[33] **Ex. 8**, *Swanson Application Rejection by IBM*, **pgs. 1 – 3** (rejection two days later on February 22, 2025).

[34] **Ex. 9**, *IBM Austin Job Posting*, **pgs. 1 – 2**.

42. As a direct and proximate result of IBM's age discrimination, Plaintiff lost his job and sustained wage and benefit losses and has incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

43. As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff has lost earnings capacity.

**B. Count 2: Discrimination under Texas Labor Code § 21.051 of the Texas Commission on Human Rights ACT (TCHRA).**

44. Plaintiff incorporates by reference all allegations in this Complaint.

45. IBM discriminated against Plaintiff on the basis of his age by terminating him from his employment and preventing him from obtaining other employment at IBM in violation of Texas Labor Code § 21.051.

46. IBM's violation was knowing and willful.

47. As a direct and proximate result of IBM's age discrimination, Plaintiff lost his job and sustained and will continue to sustain wage and benefit losses and have incurred and will continue to incur out-of-pocket-losses, including attorney's fees and legal costs.

48. As a direct result of Defendant's pretextual reasons proffered for termination, Plaintiff has lost earnings capacity.

## VII. JURY DEMAND

49. Plaintiff requests a trial by jury on all claims against all Defendants.

## VIII. DAMAGES

50. WHEREFORE: Plaintiff requests the Court enter judgment and relief as follows:

1) That IBM be ordered to pay the Plaintiff back pay and benefits with interest;
2) That a final judgment in favor of these Plaintiffs against IBM be entered for liquidated damages in an amount equal to the amount of back pay and benefits due to Plaintiff;

3) That IBM be ordered to reinstate Plaintiff to his former position with all lost pay and benefits, seniority and promotions;
4) That in the alternative to reinstatement, IBM be required to pay Plaintiff front pay and benefits in the event reinstatement is not feasible;
5) Penalties available under applicable law;
6) Costs of this action incurred herein, including expert fees;
7) Attorneys' fees;
8) Pre-judgment and post judgment interest, as provided by law, and
9) Such other and further legal and equitable relief as this Court may deem just and proper.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas 78723
512/476-4600
512/476-5382 (Fax)

By:________________________
Heidi A. Coughlin
State Bar No. 24059615
hcoughlin@w-g.com
Stephen B. Barron
State Bar No. 24109619
sbarron@w-g.com
Archie Carl Pierce
State Bar No. 15991500
cpierce@w-g.com

***ATTORNEYS FOR PLAINTIFF***